UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

UNITED STATES OF AMERICA,              )
                                       )
        Plaintiff/Respondent,          )        No. 6:20-CR-11-REW-HAI-1
                                       )        No. 6:23-CV-181-REW-HAI
v.                                     )
                                       )
MICHAEL WALLACE,                       )        OPINION & ORDER
                                       )
        Defendant/Petitioner.          )

*** *** *** ***

Petitioner Michael Wallace, through counsel, filed a timely motion to vacate under 28

U.S.C. § 2255.  *See* DE 228 (Motion).  Wallace raised four basic claims, all of which are premised

on the allegedly ineffective assistance of his attorney, Robert Norfleet.  *See generally* DE 228-1

(Petition).  First, Wallace argued that Norfleet inadequately impeached two key witnesses—Robert

Beach and Timothy Sizemore—at trial.  *See id.* at 4–10.  Second, Wallace asserted that Norfleet

acted deficiently in failing to request that items obtained in Beach's hotel room and Sizemore's

vehicle be DNA tested.  *See id.* at 10–12.  Third, Wallace contended that Norfleet should have

secured witness testimony from Alexus Adams.  *See id.* at 13–14.  And fourth, Wallace suggested

that Norfleet did not fulfill his duty to obtain exculpatory evidence regarding law enforcement

officer James Mayfield's trustworthiness.  *See id.* at 15–16.

On referral, United States Magistrate Judge Hanly A. Ingram recommended that the

undersigned deny Wallace's motion and deny a certificate of appealability on all issues.  *See*

DE 243 (Recommended Disposition).  Judge Ingram informed Wallace of his right to object to his

recommendation under 28 U.S.C. § 636(b)(1).  *See id.* at 14.  Wallace timely objected, *see* DE 249,

and the Government responded in opposition, *see* DE 251.

For the following reasons, the Court OVERRULES Wallace's objections, ADOPTS Judge Ingram's Recommended Disposition, and DENIES Wallace's § 2255 motion.

## I.   BACKGROUND

On September 30, 2020, a federal grand jury returned a third superseding indictment charging Wallace with conspiracy to deprive individuals of their constitutional rights under 18 U.S.C. § 241, and possession with intent to distribute five grams or more of methamphetamine under 21 U.S.C. § 841(a)(1). *See* DE 88 (Third Superseding Indictment). Some of the relevant facts of Wallace's criminal conduct, as summarized by the Sixth Circuit, are as follows:

> The people of Pulaski County, Kentucky, elected Wallace to serve as a constable, entrusting him with law enforcement authority equal to a sheriff's. Due to the limited resources available to constables, Wallace worked primarily out of his home and used funds seized during arrests to pay for expenses such as vehicle maintenance, new uniforms, and ammunition. The Somerset Police Department also provided equipment donations and permitted him to use the Department's evidence room to store items he had seized.
>
> In 2018, Wallace pulled over Danny Hughes "for no apparent reason." After Wallace found some drugs on Hughes, he planted baggies and scales, elevating the potential charge from possession to distribution and enabling the seizure of Hughes's car.
>
> Later that year, Wallace stopped Timothy Sizemore for expired tags and called in Somerset officers for backup. Wallace claimed that his K-9 had alerted for drugs, prompting the officers to search Sizemore's car. The officers thoroughly searched the car and failed to find any contraband. At that point, Wallace, who did not participate in the initial search, approached the car saying to his fellow officers, "watch this shit." After briefly searching the vehicle, Wallace produced a pill bottle. . . .
>
> The FBI started an undercover sting operation. An FBI informant contacted Wallace through a drug tip line and reported that a "black guy" driving a "black truck" at the Somerset Mall might be trafficking methamphetamine. In accord with the planted tip, an FBI task force officer posing as "Kareem Pinkney" parked at the Somerset Mall with $11,000 in his front pocket. Wallace and another constable arrived at the mall and immediately pulled Pinkney from his truck, searched his pockets, and looked through his phone. Claiming that his K-9 had alerted for drugs, Wallace also searched Pinkney's truck. Pinkney passed field sobriety tests administered by a Burnside police officer. The officer told Wallace he was not

2

going to arrest Pinkney because there "wasn't much there."  Wallace nevertheless arrested Pinkney for public intoxication and booked him into jail, where he remained until the FBI secured his release.

In late 2019, Kayla Dobbs was returning to Pulaski County along with three friends after a night on the town in Lexington.  The fun ceased when the designated driver pulled to the side of the road to clean a passenger's vomit.  Wallace pulled up behind the car and ordered the intoxicated Dobbs to drive it to a nearby parking lot.  Dobbs protested, saying she had been drinking.  Wallace told her to drive the car anyway and said she would not "get in trouble."  As soon as Dobbs started the car, however, Wallace activated his lights and pulled her over.  Wallace removed her from the car, told her that "we can make all of this go away," and "stuck his hand up [her] skirt and felt [her] butt."  Relying on a purported alert from his ever-reliable K-9, Wallace searched the car.  He did not find any contraband, but proceeded to arrest Dobbs for DUI.

In early 2020, FBI agents confronted Wallace.  He denied having any controlled substances in his home but consented to a search.  When asked about his safe, Wallace stated "[t]here's nothing in there."  The tangled web began to unravel when agents found 5.9 grams of methamphetamine in the safe, as well as nearly 30 firearms around the property.

*United States v. Wallace*, 51 F.4th 177, 180–81 (6th Cir. 2022) (internal citations omitted).

At trial, the jury heard testimony from, among others, Robert Beach, *see* DE 213 at 66–90 (Trial Transcript—Day Two), Timothy Sizemore, *see id.* at 91–107, James Mayfield, *see id.* at 32–45, Andrew Salmons, *see id.* at 7–31, and Nicholas Taylor, *see id.* at 46–63.  These latter three were employed by the Somerset Police Department at the time of the Sizemore stop and the Wallace trial.  *See id.* at 8, 32, 46.  Relevant to the instant matter, all five of these individuals provided testimony on the same general set of events.

On direct examination, Beach stated that he had rented two hotel rooms at a Budget Inn, one for himself and his girlfriend, and one for Alexus Adams.  *See id.* at 67–68. When Sizemore and Adams arrived together, Beach provided the pair with a small amount of methamphetamine, which they used.  *See id.* at 68.  Sizemore's testimony corroborates Beach's version of events.  *See id.* at 91–94.  Sizemore further asserted that he and Adams used all of Beach's methamphetamine

3

while in one of the hotel rooms. *See id.* at 94. After finishing the drugs, Sizemore returned to his car and departed. *See id.* at 94.

But Sizemore did not get far before he was pulled over by Constable Wallace. *See id.* Wallace proceeded to retrieve his police dog, remove Sizemore from his vehicle, and conduct a search. *See id.* At that point, other officers had arrived on the scene to assist with the search, including Officer Mayfield, *see id.* at 33–34, Officer Salmons, *see id.* 8–9, and Officer Taylor, *see id.* at 47–50. The trained Somerset officers searched the car thoroughly, finding nothing, and Sizemore asserted that he had no drugs in his possession. Wallace had not participated in the search but immediately walked to the car and managed to produce a pill bottle and a cigarette pack containing Percocet prescription tablets and suspected methamphetamine. *See id.* at 35, 95–96; DE 195 ¶¶ 10–20, at 5–7 (Presentence Investigation Report); DE 194 (Sentencing Minutes) (adopting DE 195).

Despite their diligent efforts, none of the other officers had been able to find drugs in Sizemore's vehicle. *See* DE 213 at 9, 34–36, 48–49. Suspicious of Wallace's discovery, Officer Salmons reported the incident to his supervisor. *See id.* at 12–13. Wallace had said "watch this shit" before he went and "found" the pill bottle.

Following a five-day trial, Wallace was convicted on both charged counts. *See* DE 149 (Jury Verdict). The Court sentenced Wallace to 140 months' imprisonment. *See* DE 196 (Judgment). Wallace then appealed to the Sixth Circuit, challenging the sufficiency of the evidence supporting his drug conviction and the dangerous weapon enhancement supporting his sentence. *See Wallace*, 51 F.4th at 181. The Sixth Circuit affirmed in whole. *See id.* at 181–83.

Wallace proceeded to file a timely § 2255 petition. *See* DE 228. In that petition, Wallace asserted that his trial counsel, Robert Norfleet, rendered constitutionally deficient assistance. *See*

4

*id.* The Government responded in opposition to Wallace's filing, *see* DE 240, and Wallace filed a reply, *see* DE 242.

On referral, Judge Ingram found that Wallace had failed to establish the requisites of ineffective assistance of counsel (IAC) on any of the grounds offered. *See* DE 243 at 13. Judge Ingram recommended that the undersigned deny Wallace's motion and deny a certificate of appealability (COA) on all issues. *See id.* Wallace, now *pro se*, has filed objections to Judge Ingram's Recommended Disposition.[1] *See* DE 249. The Government responded in opposition to Wallace's objections. *See* DE 251. The matter is ripe for judgment.

## II. STANDARD OF REVIEW

### A. Claims Under 28 U.S.C. § 2255

Pursuant to 28 U.S.C. § 2255(a), a person in custody under sentence of a federal court "may move the court which imposed the sentence to vacate, set aside, or correct the sentence" if that person "claim[s] the right to be released upon the ground that the sentence was imposed in violation of the Constitution" or otherwise is subject to collateral attack. Relevant to the present matter, a trial attorney's ineffective assistance can warrant relief under § 2255 when it arises to the level of a Sixth Amendment violation. *See Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999) (citing *Strickland v. Washington*, 104 S. Ct. 2052, 2064–65, 2068 (1984)). However, the petitioner must do more than identify a constitutional error. The movant must establish—by a preponderance of the evidence—that the error had a "substantial and injurious effect or influence on the proceedings." *Watson v. United States*, 165 F.3d 486, 488 (6th Cir. 1999) (citing *Brecht v.*

---

[1] While Wallace's initial § 2255 petition and reply were filed by counsel, *see* DE 228 at 2; DE 242 at 9, his objections were filed by Stacy Wallace, his wife, who holds power of attorney, *see* DE 249 1, 17. The Court, in this unusual posture, accepts the filing as made by Wallace via his authorized signatory.

*Abrahamson*, 113 S. Ct. 1710, 1722 (1993)); *see also McQueen v. United States*, 58 F. App'x 73, 76 (6th Cir. 2003) (per curiam).

Notably, the petitioner "must set forth facts which entitle him to relief.  Conclusions, not substantiated by allegations of fact with some probability of verity, are not sufficient to warrant a hearing," let alone a favorable judgment.  *O'Malley v. United States*, 285 F.2d 733, 735 (6th Cir. 1961) (collecting cases).  But a hearing is not required "if the petitioner's allegations 'cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.'"  *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999) (quoting *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995)).  Wallace makes no objection to Judge Ingram's recitation of the *Strickland* prongs, so the Court incorporates those fully.

### B.    Objections to a Magistrate Judge's Recommended Disposition

In evaluating a magistrate judge's recommendation, the Court must review *de novo* the "portions of the report or specified proposed findings" to which any party objects.  28 U.S.C. § 636(b)(1)(C).  The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  *Id.*  However, the Court is not required to "review . . . a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings."  *Thomas v. Arn*, 106 S. Ct. 466, 472 (1985); *see also United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981) (holding that a failure to file objections to a magistrate judge's recommendation waives the right to appellate review).  The Court tailors its analysis accordingly.

6

III.    ANALYSIS

A.    **Waived Claims**

Before turning to the merits of Wallace's petition, it is necessary to identify the claims in his reply and objections that are procedurally barred.  First, the Court addresses Wallace's reply. In his reply, Wallace argued that Norfleet was ineffective in his handling of evidence relating to the Government's claims that Wallace:  (1) framed Danny Hughes; (2) illegally arrested and searched an undercover FBI agent; (3) framed and sexually assaulted Kayla Dobbs; and (4) possessed methamphetamine in his home safe.  *See* DE 242 at 2–8.  However, Wallace failed to even reference these subjects in his initial petition, let alone allege that they were grounds for (or were examples of) an IAC claim.  *See generally* DE 228-1.  Wallace provides no justification or excuse for his failure to do so.  As a result, Judge Ingram determined that Wallace waived all arguments raised for the first time in his reply.  *See* DE 243 at 3.  The Court, facing no objection to this finding, agrees and adopts Judge Ingram's well-reasoned conclusion.  The Court will assess none of those topics.

Second, the Court turns to Wallace's objections.  Wallace dedicates multiple pages of his objections to issues that he acknowledges "the Court will not address because they were not included in the original motion."  *See* DE 249 at 12–17.  Specifically, Wallace alleges that the Government intentionally misled the jury and violated its disclosure obligations under *Brady*, *see id.* at 5–6, 14, that the Court provided the jury with incorrect instructions, *see id.* at 7, that Norfleet failed to investigate the text messages sent on Beach, Sizemore, and Adams's confiscated cell phones, *see id.* at 8, that both Danny Hughes and Kayla Dobbs lied at trial, *see id.* at 12–13, that Daryl Kegley, an FBI task force officer, engaged in misconduct during his investigation, *see id.* at 14–15, and that the methamphetamine contained in his safe was tampered with by the Government,

7

*see id.* at 16–17. But Wallace is, fatal to his filing, correct—a movant may not raise claims for the first time in an objection to a dispositive recommendation. *See Murr v. United States*, 200 F.3d 895, 902 n.1 (6th Cir. 2000). Thus, Wallace's admittedly untimely arguments necessarily fail.

Even setting aside these improper arguments, Wallace—in a cursory manner and without reference to Judge Ingram's specific findings—does little more than re-invoke or expand upon the arguments initially raised in his § 2255 petition. The Sixth Circuit Court of Appeals has previously recognized that "[t]he filing of vague, general, or conclusory objections does not meet the requirement of specific objections and is tantamount to a complete failure to object." *Cole v. Yukins*, 7 F. App'x 354, 356 (6th Cir. 2001) (citing *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995)); *see also Holl v. Potter*, No. 1:09-CV-618, 2011 WL 4337038, at *1 (S.D. Ohio Sept. 15, 2011) ("Objections that merely restate arguments raised in the memoranda considered by the Magistrate Judge are not proper, and the Court may consider such repetitive arguments waived."). And indeed, a majority of Wallace's objections are properly classified as "vague, general, or conclusory." *Cole*, 7 F. App'x at 356. An objection of such quality is a nullity.

That said, Wallace now appears to be proceeding *pro se*. *See* DE 249 at 1. As such, the Court will construe his new filing liberally. *See United States v. Kirkpatrick*, No. 1:96-CR-81, 2009 WL 2823658, at *7 (E.D. Tenn. Aug. 28, 2009) ("Many prisoners file inartfully drafted *pro se* post-conviction motions without specifying the legal basis for the requested relief. In an effort to assist *pro se* prisoners who are unaware of the applicable statutory framework governing post-conviction relief, the courts often liberally construe and recharacterize such filings."). Still, Wallace does not reference a reason or explanation for lodging his objections without the assistance of counsel, and the Court's leniency for *pro se* filings has its limits: a "[l]iberal construction does not require a court to conjure allegations on a litigant's behalf." *Martin v.*

8

*Overton*, 391 F.3d 710, 714 (6th Cir. 2004) (quoting *Erwin v. Edwards*, 22 F. App'x 579, 580 (6th Cir. 2001)).  Thus, while the Court will consider those of Wallace's objections that grapple with Judge Ingram's careful work and build upon the claims initially raised in his § 2255 petition, it will not issue a substantive ruling on any of Wallace's other, undeveloped and procedurally improper objections.

### B.    Surviving IAC Claims

The Court now turns to the merits of Wallace's properly lodged objections.  In his initial petition, Wallace alleged that Norfleet failed to:  (1)  utilize  evidence of Beach and Sizemore's prior inconsistent statements to impeach; (2) request DNA testing for the evidence seized from Beach's hotel room and Sizemore's car; (3) secure Adams's witness testimony, or at least request a continuance in order to do so; and (4) obtain exculpatory impeachment evidence regarding Mayfield's trustworthiness.  *See generally* DE 228.  But Wallace has not provided sufficient evidence for any of these grounds to support his IAC claim (as to deficiency or prejudice), and his objections to Judge Ingram's recommendation are unavailing.

In order to establish an IAC claim, the petitioner must first "show that counsel's performance was deficient." *Strickland*, 104 S. Ct. at 2064.  That is, the petitioner must establish that the attorney made errors so serious that they were "not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*  The petitioner must then show that "the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Id.*

But because it is uniquely difficult to assess an attorney's performance after the fact, the Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that . . .

9

the challenged action 'might be considered sound trial strategy.'" *Id.* at 2065 (quoting *Michel v. Louisiana*, 76 S. Ct. 158, 164 (1955)).  The Court will therefore make a conscientious effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

### 1. Failure to Impeach Beach and Sizemore with Prior Inconsistent Statements (or otherwise)

Wallace claimed that Norfleet failed to properly utilize Beach and Sizemore's pre-trial statements that allegedly conflicted with their testimony at trial.  Wallace's claims and objections will be evaluated in turn, beginning first with those pertaining to Beach's testimony, and turning next to those pertaining to Sizemore's testimony.

#### i.  Beach's Prior Statements

Wallace objects to Judge Ingram's finding that Norfleet's alleged failure to impeach Beach's testimony was insufficient to support his IAC claim.  *See* DE 249 at 3–5.  But while Wallace spends a significant portion of his objections recounting the prior inconsistent statements that Norfleet could have relied upon to impeach Beach, he failed to include those statements, with any detail or in any substance, in his initial petition or reply.  *See generally* DE 228; DE 242.  Wallace has once again added new facts at an inappropriate time.  *See Murr v. United States*, 200 F.3d 895, 902 n.1 (6th Cir. 2000) ("Petitioner did not raise this claim in his initial § 2255 motion.  Rather, it was first raised in his supplemental objections to the magistrate judge's final Report and Recommendation. . . .  The magistrate thus never had the opportunity to consider this issue. . . . Hence, Petitioner's failure to raise this claim before the magistrate constitutes waiver." (internal citations omitted)).  This was just Judge Ingram's point in rejecting the vague impeachment theory.

In his initial petition, Wallace included a lone reference to Beach's testimony at trial, noting that "Beach's statements and testimony differed from the plea soliloquy [sic] he gave" in an earlier

10

criminal proceeding.  DE 228-1 at 4.  However, Judge Ingram correctly noted that "Wallace fails to provide any specific examples where counsel could have or should have impeached Beach.  This claim is insufficiently factually developed to form a basis for relief.  For any alleged failure to properly impeach Beach, Wallace fumbles his burden of showing both deficient performance and prejudice."  DE 243 at 9–10.  Wallace offers nothing in his objection to alter Judge Ingram's analysis of the argument *raised* in his initial petition.  As such, he has not established that Norfleet's alleged failure to impeach Beach's testimony supports his IAC claim.  The "jail calls" Wallace adverts to perfectly exemplify an improper matter first raised only in an objection.

### ii.   Sizemore's Prior Statements

Wallace alleged in his initial petition that Norfleet failed to:  (1) properly request, obtain, and otherwise investigate Sizemore's purportedly conflicting statements; (2) use Sizemore's conflicting statements to impeach him at trial; and (3) request a mistrial once the inconsistencies in Sizemore's testimony became apparent.  *See* DE 228-1 at 5–10.  However, Judge Ingram carefully dispatched each of these arguments, and nothing in Wallace's objections causes the Court to deviate from his conclusions.

At trial, Sizemore testified that he and Adams entered a Budget Inn hotel room and consumed the methamphetamine that Beach had given them.  *See id.* at 5–7.  According to Wallace, Sizemore's testimony directly contradicted claims that he had made in a prior interview with law enforcement – namely, that he had only dropped Adams off at the Budget Inn.  *See* DE 228-4 at 1 (Sizemore Interview).  Wallace also cited a handwritten note that was drafted with Sizemore's prior interview at some point, simply reading "needle cap wrapped in cellophane." *See id.* at 3.  To Wallace, this note suggested that Sizemore told law enforcement about contraband in his vehicle during the traffic stop, a fact that Norfleet did not address at trial.  *See* DE 228-1 at 9.

11

Wallace specifically objects to Judge Ingram's conclusion that Norfleet had impeached Sizemore's testimony, *see* DE 243 at 5–9, asserting that the impeachment "simply did not happen," *see* DE 249 at 2.  Wallace further argues that Norfleet "never asked Sizemore about why his [prior interview with law enforcement] did not state anything about two hotel rooms that night, [or why he claimed that] he simply dropped [Adams] off [with] no mention of another hotel room."  *Id.*  However, as Judge Ingram noted, the portion of the trial transcript capturing Sizemore's testimony flatly contradicts Wallace's version of events.  The cross:

> Q.    Did you go inside the hotel room?
>
> A.    The room that he rented for Alexus I did.
>
> Q.    So you was in the hotel room?  For how long?
>
> A.    About ten minutes, 15 tops.
>
> Q.    Did you tell Agent Cox, on January 8, 2019, that you didn't go into the hotel?
>
> A.    I didn't go into the room that [Beach] was staying.  I went in the room with Alexus.
>
> Q.    Did you not tell him you dropped a girl off and never went inside?
>
> A.    I didn't go inside of the room that [Beach] was staying in.  I went inside the room that he rented for Alexus.
>
> Q.    Well, you never said anything about going inside any room.  You said you dropped the girl off and never went inside.
>
> A.    It's been two year.
>
> Q.    So it's possible you did tell Agent Cox that?
>
> A.    It's possible.
>
> Q.    Well, that's different than what you testified under oath already.
>
> A.    I didn't go into Beach's—Robert Beach's room.  I went into a room with Alexus.

12

DE 213 at 99–100. Thus, Norfleet was clearly aware of Sizemore's earlier statements (which scotches the failure to acquire theory), and indeed, he expressly used them to impeach Sizemore. Wallace's objections are flatly disproven by the record.

Wallace also objects to Judge Ingram's finding that Norfleet's supposed failure to impeach Sizemore's credibility with evidence of his sobriety on the night of the stop was not deficient. *See* DE 249 at 2–3. But Wallace is simply re-raising an argument he has already made. *See* DE 228-1 at 8–9. Judge Ingram adequately addressed Wallace's argument in evaluating his initial petition, finding that there was no strategic need for Norfleet to try to establish Sizemore's purported sobriety:

> Sizemore *was* taken from the scene in custody. [Additionally], while it is true that Sizemore was not charged that night with 'driving under the influence, public intoxication or other violation of laws meant to protect the public,' the fact that Sizemore was not formally charged with *anything* that night was revealed at the beginning of cross-examination.

DE 243 at 8. Further, counsel plainly established Sizemore as a regular user with significant issues of trouble in his background. The context, of course, involves multiple Somerset officers corroborating a scene where Sizemore had no contraband in his car and yet Wallace alone, after the officers' fruitless search, immediately produced alleged drugs from the car, after ominously flagging his own imminent conduct, "watch this shit." The sobriety angle makes little sense and would not have had an impact on this record. Once again, the record helps to disprove Wallace's claim and ultimately renders his objection meritless.

Finally, Wallace objects to Judge Ingram's conclusion that "Sizemore's testimony about Wallace planting contraband in his car was consistent with testimony from the three other officers at the scene." *Id.* at 10; *see* DE 249 at 6–7. Wallace specifically notes that "neither Sizemore nor the three . . . officers ever state[d] that they saw Wallace with a pill bottle prior to him finding it."

DE 249 at 6.  But Wallace misunderstands.  Judge Ingram was not asserting that Sizemore and the three officers had all seen Wallace with the pill bottle prior to his discovery.  Rather, he was suggesting that Sizemore and the three officers all provided relatively similar accounts of the stop.  That undoubtedly is an accurate characterization, and Wallace has done nothing to dispute that conclusion.

As demonstrated above, Wallace has objected to many of Judge Ingram's findings regarding Norfleet's treatment of Sizemore's testimony.  However, Wallace's objections do not address Norfleet's alleged failure to explore evidence about the needle cap purportedly found in Sizemore's vehicle.  With no objection raised, the Court adopts Judge Ingram's well-reasoned analysis:

> The exhibit referenced here . . . appears to be notes memorializing what one officer saw when Wallace became involved in the stop.  There is a line that can be interpreted to say, "– needle cap wrapped in cellophane."  This appears to be the only reference in the record to such an item.  It is not even mentioned in Wallace's own subsequent search warrant.  DE 214 at 71–72.  Given the vagueness surrounding this item, failure to explore it at trial does not amount to deficient performance.  Nor does the evidence preponderate in finding that this needle cap would so torpedo Sizemore's credibility such that the result of the proceedings could have been different.

DE 243 at 9 (formatting of internal citations altered).  In sum, after addressing Wallace's objections, neither Norfleet's purported neglect of the handwritten note referencing a "needle cap wrapped in cellophane," nor Norfleet's alleged failure to impeach Sizemore's testimony, provides sufficient support for Wallace's IAC claim.  The "needle cap," really only a note reference and nothing more, is without impact on the tide of proof Wallace faced.

### 2. Failure to Request DNA Testing for Evidence Found in Beach's Hotel Room and Sizemore's Vehicle

In his initial petition, Wallace argued that Norfleet should have requested DNA testing for the "drugs, empty baggies, [and] 'needles and stuff' located in Mr. Beach's hotel room," as well

14

as "the bag, pill bottle, and syringe / pieces of syringe found in Mr. Sizemore's vehicle door." DE 228-1 at 11. Wallace asserted that such "testing would have revealed whether or not Mr. Beach and / or Mr. Sizemore had been in contact with the evidence." *Id.* at 10.

While Wallace has struggled to articulate exactly how such testing would exonerate him, he suggested in his initial petition that the absence of Sizemore's DNA on any one of these items could have been used to impeach his testimony. *See id.* at 10–11. Judge Ingram, however, found that argument unavailing, concluding that if "Sizemore had *not* actually used drugs the night of the traffic stop, but lied in his testimony that he *had* used drugs," then that evidence would not change the result of the trial. DE 243 at 11. Seemingly, Wallace does not object to that conclusion. *See* DE 249 at 8–9. As such, the Court adopts Judge Ingram's well-reasoned conclusion with respect to this theory.

But while Wallace does not dispute Judge Ingram's analysis, he does use his objections to provide a novel explanation as to why DNA testing could have proven helpful to his case.[2] *See id.* Wallace asserts that he never planted a pill bottle in Sizemore's vehicle; rather, the drugs that he discovered belonged to Sizemore. *See id.* at 8. Because of that fact, Sizemore's DNA should have been present on the bottle. *See id.* Moreover, if Beach was the one who provided the drugs to Sizemore, then his DNA should have also been present on the bottle. *See id.*

But regardless of his actual theory, Wallace's claim fails. It is a "longstanding and sound principle that matters of trial strategy are left to counsel's discretion." *Dixon v. Houk*, 737 F.3d 1003, 1012 (6th Cir. 2013). Relying on that principle, courts routinely reject IAC claims premised

---

[2] The novelty of Wallace's argument is likely enough to defeat it. When a petitioner raises an argument for the first time in their objections to a magistrate judge's recommendation, that argument is waived. *See Murr*, 200 F.3d at 902 n.1. However, because Wallace at least referenced the merits DNA testing in his initial petition—albeit, in an ambiguous fashion—the Court is willing to consider his argument. *See* DE 228-1 at 10–11.

on an attorney's decision to forgo DNA testing.  *See, e.g.*, *Hall v. United States*, 41 F. App'x 743, 745 (6th Cir. 2002) (finding counsel's failure to request DNA test was a strategic decision and did not rise to level of a viable Sixth Amendment claim); *Common v. United States*, Nos. 1:12-CR-82 & 1:15-CV-173, 2018 WL 4604018, at *3–4 (E.D. Tenn. Sept. 25, 2018) (collecting cases and rejecting the argument that counsel was ineffective for declining to request DNA testing of firearm as part of larger case strategy).

Here, Norfleet's decision not to request DNA testing was a reasonable strategic choice. True, the presence of Beach's DNA on the pill bottle would have helped Wallace's case.  However, the absence of Sizemore and Beach's DNA would surely have further harmed Wallace's position. Additionally, if Sizemore's DNA was found on the pill bottle, but not Beach's, then that would have only marginally benefited Wallace's case.  The bottle, after all, came from a glove in the door pocket.  Because the Government's theory was that Wallace planted the container in Sizemore's car after interacting with and touching Sizemore, the presence of his DNA on the pill bottle would not have been overly surprising.  Faced with these possibilities, Norfleet could have reasonably concluded that the risk associated with an unfavorable test result outweighed the potential benefit of a positive test result.  Accordingly, his decision to refrain from testing the container was not enough to support Wallace's IAC claim.  And, in any event, the result of such testing is not something Wallace puts before the Court.  A result favorable to Wallace is fully speculative on this record.

### 3.  Failure to Secure Alexus Adams's Testimony

Wallace also alleged in his initial petition that Norfleet failed to secure Alexus Adams's testimony, thereby "depriving Defendant Wallace . . . of a fair trial."  *See* DE 228-1 at 13–14. Wallace speculates that Adams would have provided key testimony that contradicted Beach and

16

Sizemore's "unreliable" statements, particularly regarding whether Sizemore consumed meth at the Budget Inn prior to the traffic stop. *See id.*

Judge Ingram rejected this argument, finding that Wallace could "only speculate as to what Adams might have said at trial and whether this would have helped his case." DE 243 at 11. Judge Ingram further noted that Wallace's argument failed on procedural grounds because he had not submitted an affidavit by Adams stating that she was (a) available to appear at trial and (b) would have given testimony favorable to Wallace's defense. *See id.* Wallace's objection to Judge Ingram's conclusion merely re-states his arguments and offers no corroborating facts (instead, only a non-specific, hearsay reference to an interview by counsel) as to how Adams would have testified.

Wallace has not produced any new evidence, such as an affidavit, to support his naked speculation that Adams's testimony "would clearly have impeached both Sizemore and Beach." DE 249 at 10. Lacking any such support, Norfleet's failure to secure Adams's testimony cannot support Wallace's IAC claim. *See Tinsley v. Million*, 399 F.3d 796, 810 (6th Cir. 2005) ("Tinsley has not introduced affidavits or any other evidence establishing what [uncalled witnesses] would have said. . . . In the absence of any evidence showing that they would have offered specific favorable testimony, Tinsley cannot show prejudice from counsel's strategy recommendation not to introduce this evidence."); *United States v. Alqsous*, No. 1:16-CR-329-2, 2025 WL 896095, at *7 (N.D. Ohio Mar. 24, 2025) ("Alqsous has not produced any evidence, such as an affidavit, declaration, or interview report, to support what he claims these potential witnesses might have said. . . . Instead, he merely offers his guess as to what each potential witness might have testified to if called at trial. This falls short of establishing ineffectiveness." (internal citation omitted)).

17

Wallace did tender a 302 in which Adams, per the reporting agent, admitted that Sizemore brought her to the hotel and that Beach planned to give Sizemore drugs or money as compensation. Adams claimed not to have seen any transaction because she was in Beach's car charging her phone. So, if available, she might have helped Wallace by contradicting Sizemore. But she might have hurt Wallace by confirming that Beach intended to provide Sizemore a small amount of drugs. Nothing from Wallace establishes that Adams would have been available for trial, and nothing contains her non-hearsay contribution to the facts. Judge Ingram noted this deficit.

And even if Wallace *had* supported his argument with corroborating proof, he has not shown that Adams's testimony would have likely changed the outcome at trial. Her testimony, as described by Wallace, would have had no direct, probative impact on the actual substantive dispute at the heart of the case (i.e., whether Wallace planted the drugs in Sizemore's car). Instead, it would have merely served as additional ammunition for impeaching Sizemore's statements about entering the Budget Inn and using methamphetamine prior to the traffic stop. Given the Court's finding that Norfleet did, in fact, impeach Sizemore on this very issue, Adams's testimony would have been only marginally useful. Such proof would have done little on the facts of the drug seizure. And, of course, this merely was one troubling aspect of the full case, where authorities showed impropriety by Wallace as to multiple other citizen victims, an FBI informant, and in Wallace's own home, where he lied to the searching agents.

### 4. Failure to Obtain Exculpatory Evidence Relating to Officer Mayfield's Trustworthiness

Finally, Wallace argued in his initial petition that Norfleet failed to investigate whether one of the Government's witnesses, Officer Mayfield, was (a) "involved in questionable activities *preceding and during trial*" and (b) had "lost his job due to untrustworthiness." DE 228-1 at 15 (emphasis added). In support, Wallace points to *Daugherty v. Somerset Police Department*,

18

No. 6:21-CV-197 (E.D. Ky. filed Nov. 24, 2021), a civil lawsuit involving an excessive force complaint against Mayfield and a number of other officers in the Somerset Police Department. *See id.* According to Wallace, Norfleet should have investigated and requested the disclosure of certain information relating to that lawsuit because "[i]nformation regarding Mr. Mayfield's use of excessive force is exculpatory in that it affects his credibility." DE 228-1 at 15.

But as Judge Ingram explained, Wallace's arguments crack under the timeline of events. First, Mayfield was employed as an officer with the Somerset Police Department at the time of trial, making it impossible for Norfleet to inquire into why he "lost his job." *See* DE 243 at 13 (citing DE 213 at 32). Second, while Mayfield testified at trial on June 16, 2021, the *Daugherty* lawsuit was not filed until approximately five months later. *See id.* at 12–13. Wallace provided no evidence (just conjecture) that either side knew of the impending lawsuit at the time of trial, and gave no explanation as to why the lawsuit, which ultimately settled in 2023, would have been admissible for the purpose of attacking Mayfield's truthfulness.

In his objections, Wallace does not dispute the accuracy of Judge Ingram's assessment. Rather, he asserts that the Government knew of Officer Mayfield's "shady past" and was aware of an ongoing investigation into his conduct at the time of trial. DE 249 at 10. But even overlooking the fact that Wallace cannot establish Officer Mayfield was the subject of an investigation at the time of trial, his claim must fail. Wallace is essentially objecting to the fact that the Government failed to disclose potentially exculpatory evidence in violation of their *Brady* obligations. But his § 2255 petition is based on Norfleet's purportedly deficient performance, not the Government's alleged wrongdoing. To put it plainly, nothing suggests that Norfleet's failure to investigate the *Daugherty* lawsuit, which was not yet in existence at the time of trial, could support an IAC claim.

IV.    CONCLUSION

For the above-stated reasons, the Court ORDERS as follows:

1.  The Court OVERRULES Wallace's objections, DE 249;

2.  The Court ADOPTS DE 243, Judge Ingram's Recommended Disposition, and DENIES DE 228, Wallace's § 2255 petition; and

3.  The Court further DENIES a COA.  Wallace has not made a "substantial showing" as to any claimed denial of rights.  Nor has he shown that "jurists of reason could disagree with the . . . resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 123 S. Ct. 1029, 1034 (2003) (citing *Slack v. McDaniel*, 120 S. Ct. 1595, 1603–04 (2000)).  For all of the same reasons pointed out by Judge Ingram, no COA should issue.  Wallace flyspecks counsel's work, but Wallace's trial counsel strategically tested the proof and witnesses and presented associated credibility matters to the factfinder.  That the jury believed the Government's proof, a detailed, multi-aspect tale of enforcement illegality, does not establish ineffective assistance of counsel.

This the 15th day of June, 2025.

Signed By:
__Robert E. Wier__
**United States District Judge**

20